IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-04169-NKL |
| | ) | |
| STUART HEAD, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is defendant Stuart Head's motion for summary judgment, Doc. 57. Mr. Head argues he is entitled to summary judgment because 1) Allstate's claims are compulsory counterclaims in a state proceeding; 2) he is not personally liable or a guarantor under the Exclusive Agency Agreement; 3) the Key Person Agreement is not supported by consideration; 4) Allstate cannot establish breach by Mr. Head or any damages; and 5) Mr. Head has not personally misappropriated trade secrets.

For the following reasons, Mr. Head's motion is denied.

**I.     Statement of Uncontroverted Material Fact[1]**

On May 1, 2015, Allstate Insurance Company and Head Brothers Agency, LLC (HBA)

---

[1] The statement of uncontroverted material fact is taken from Defendant's statement of uncontroverted material facts in support of motion for summary judgment, Doc. 59, and Plaintiff's response, Doc. 61. The Court cites to the record directly, rather than the statements submitted by the parties.

Pursuant to Local Rule 56.1(c), "unless specifically controverted by the moving party, all facts set forth in the statement of the opposing party are deemed admitted for the purpose of summary judgment." Allstate responded to Mr. Head's statement of facts, and included additional facts. Doc. 61. Mr. Head did not reply to Allstate's response. Therefore, all facts set forth in Allstate's response are deemed admitted.

entered into an Exclusive Agency Agreement. Doc. 56-1 (Exclusive Agency Agreement), p. 1. The Exclusive Agency Agreement states that Allstate entered into the agreement "in reliance upon and in consideration of the skills, qualifications and representations of Stuart Head (referred to in [the Exclusive Agency] Agreement as 'Key Person'). [HBA] agrees that it will employ Key Person to provide services under [the Exclusive Agency Agreement] for its term." *Id.* (Exclusive Agency Agreement) at § II(E). Mr. Head signed the Exclusive Agency Agreement twice—once as a "Key Person" and once on behalf of HBA. *Id.* (Exclusive Agency Agreement) at p. 13. Also on May 1, 2017, Mr. Head, as the Key Person for HBA, signed a Key Person Agreement, which was attached as Appendix A to the Exclusive Agency Agreement. Doc. 59-2 (Head Affidavit), ¶ 2; Doc. 56-1 (Appendix A), p. 15. The Key Person Agreement is between Stuart Head and HBA, and lists Allstate as a direct third party beneficiary. Doc. 56-1 (Appendix A), p. 14.

In the Key Person Agreement, Mr. Head agreed not to "either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of [Allstate]" while employed by HBA. *Id.* (Appendix A) at ¶ 9. Mr. Head also agreed not to

> at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of [Allstate]; nor . . . use any confidential information for [his] own benefit, except for the purposes of assisting [HBA] in performing services under the [exclusive] agency agreement.

*Id.* (Appendix A) at ¶ 4. Finally, Mr. Head agreed that "all [Allstate] forms, manuals, records, and other materials and supplies furnished to [Mr. Head] by [HBA] will at all times remain the property of [Allstate] and will be returned to [Allstate] at any time upon the demand of [Allstate] . . . ," *id.* (Appendix A) at ¶ 5, and that "if requested by [Allstate], [Mr. Head] will execute an Order of Transfer of Responsibility for any telephone numbers in [his] name, which were used in connection

with the conduct of business on behalf of [Allstate]." *Id.* (Appendix A) at ¶ 8. Mr. Head did not have any telephone number in his own name. Doc. 59-2 (Head Affidavit), ¶ 5.

The Exclusive Agency Agreement states,

> For a period of one year following termination, neither [HBA], nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by [Allstate]:
> [] With respect to any person, company, or organization to whom [HBA] or anyone acting on its behalf sold insurance or other products or services on behalf of [Allstate] and who is a customer of [Allstate] at the time of termination of the [Exclusive Agency] Agreement;
> [] With respect to any person, company, or organization who is a customer of [Allstate] at the time of termination of [the Exclusive Agency] Agreement and whose identity was discovered as a result of [HBA's] status as [an Allstate] agent or as a result of [HBA's] access to confidential information of [Allstate]; or
> [] From any office or business site located within one mile of the agency sales location maintained pursuant to [the Exclusive Agency Agreement] at the time of [the Exclusive Agency Agreement] is terminated.

Doc. 56-1 (Exclusive Agency Agreement), § XVIII(D).

On May 1, 2017, Allstate sent a letter concerning the termination of the Exclusive Agency Agreement. Doc. 56-3 (Termination Letters). The termination letter notified Mr. Head that the Exclusive Agency Agreement would terminate in 90 days—on or about July 31, 2017—and Mr. Head had to immediately return all property belonging to Allstate and cease using any telephone numbers used to conduct Allstate business. *Id.* at 1; Doc. 56-2 (Head Deposition), pp. 68–69.

By June 5, 2017, Mr. Head had started a new insurance agency, Head Brothers Insurance Group (HBIG), to sell insurance for an independent agency group, Global Green Insurance Group. Doc. 56-2 (Head Deposition), pp. 64–69, 76; Doc. 56-4 (License Affiliations). HBA continued to issue new Allstate insurance through June 2017. Doc. 56-2 (Head Deposition), pp. 111–12; Doc. 56-5 (HBA Business Metrics). Mr. Head had access to Allstate's confidential information through July 31, 2017, Doc. 56-2 (Head Deposition), p. 85, but he did not personally solicit the purchase

of Allstate products or services after receiving the termination notice. Doc. 59-2 (Head Affidavit), ¶ 4; Doc. 56-2 (Head Deposition), p. 84.

Samantha Lange, who was an employee of HBA, continued to sell Allstate insurance through June 2017, by which time she was also affiliated with HBIG. Doc. 56-2 (Head Deposition), p. 110–12; Doc. 56-4 (License Affiliations), p. 2. By August 15, 2018, Ms. Lange, had sold insurance on behalf of HBIG to at least one person who had been a customer of Allstate. Doc. 56-6 (Lange Deposition), pp. 49–50; Doc. 56-7 (Anderson Insurance Card).

On or around August 25, 2017, HBA sued Allstate in state court. Doc. 59, ¶ 12; Doc. 61, ¶ 12. On September 11, 2017, Allstate sued Mr. Head in federal court for violating the Exclusive Agency Agreement. Doc. 1 (Verified Complaint). The Verified Complaint alleges that Mr. Head breached the Exclusive Agency Agreement by

> operating a competing insurance business while still an Allstate Exclusive Agent; [] failing to return Allstate confidential and proprietary information; [] continuing to use Allstate telephone number(s) previously associated with [Mr. Head's] Allstate Exclusive Agency; [] misusing Allstate confidential information to solicit Allstate customers to his competing insurance agency; and [] soliciting Allstate customers during [Mr. Head's] one year non-solicitation period.

Doc. 1 (Verified Complaint), ¶ 79. Additionally, Allstate alleges that Mr. Head misappropriated trade secrets, as defined by Mo. Rev. St. § 417.450 *et seq.* and 18 U.S.C. § 1832 *et seq.*, by using Allstate's trade secrets without its consent. Doc. 1 (Verified Complaint), ¶¶ 88, 93, 94, 104, 105.

**II.    Standard**

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D &M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010); Fed. R. Civ. P. 56(a). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert*

*Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not appropriate when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Conclusory affidavits . . . do not provide a basis upon which to deny motions for summary judgment." *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993).

### III. Discussion

#### A. Compulsory Counterclaim

Mr. Head argues that HBA's pending state court action against Allstate which alleges breach of the Exclusive Agency Agreement, makes any claim against Mr. Head for breach of that same contract, a compulsive counterclaim that had to be raised in state court. Mr. Head does not offer into the record a copy of the pleadings before the Circuit Court of Boone County, or provide the Court with any other evidence to support his conclusory statement.[2]

Because Mr. Head has not put forth sufficient facts for the Court to determine the issue, nor provided legal authority for his argument, the Court cannot conclude that Allstate's claims against Mr. Head are compulsory counterclaims in the pending state action. Therefore, summary judgment on this basis is denied.

#### B. Breach of Contract

To succeed on its claim for breach of contract, Allstate must prove 1) the existence and terms of a contract, 2) the plaintiff performed its obligations under the contract, 3) breach of

---

[2] In a footnote to his Statement of Uncontroverted Material Facts, Mr. Head states that the Court can take judicial notice of the case in state court. The Court declines to expand the record on its own.

contract by the defendant, and 4) damages. *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (*en banc*). Mr. Head contests the first, third and fourth elements.[3]

1. *The Existence of a Contract*

    a. Whether Mr. Head Is Bound by the Exclusive Agency Agreement

Mr. Head argues that, as a matter of law, he is not personally liable under the Exclusive Agency Agreement because he is not a party to the Exclusive Agency Agreement. Mr. Head apparently concedes, as he must, that he is a party to the Key Person Agreement. Allstate argues that the Exclusive Agency Agreement and the Key Person Agreement are two parts of the same contract, and that Mr. Head, as a Key Person, is personally bound to comply with the terms of the contract and is also personally responsible for HBA's compliance under that contract.

As a preliminary matter, the Exclusive Agency Agreement and the Key Person Agreement are either two parts of a single contract that should be interpreted as a whole or two separate contracts that should be read together to determine the intent of the parties. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." *Cure v. City of Jefferson*, 380 S.W.2d 305, 310 (Mo. 1964) (citing the Restatement of Contracts); *accord Dakota Gasification Co. v. Nat. Gas Pipeline Co. of Am.*, 964 F.2d 732, 734 (8th Cir. 1992) (citing the Restatement (Second) of Contracts, § 202(2) (1981), ("Where the execution of one contract depends on the execution of other contracts . . . the contracts must be interpreted collectively")). Additionally, "Missouri law provides that multiple instruments

---

[3] With respect to the second element, Allstate pled that it "has performed all of the duties and obligations it owes Head under his EA Agreement." Doc. 1, ¶ 78. Mr. Head only disputes that any "obligations were owed . . . ." Doc. 39, ¶ 78. Thus, there is no dispute as to Allstate's performance.

6

executed at the same time and relating to the same transaction may be read together." *N. Am. Sav. Bank v. Resolution Tr. Corp.*, 65 F.3d 111, 114 (8th Cir. 1995).

Here, both agreements pertain to HBA's exclusive relationship with Allstate and Mr. Head's obligations as Key Person of HBA. The Key Person Agreement is attached as Appendix A to the Exclusive Agency Agreement. Doc. 56-1 (Appendix A), p. 14. The Agency Agreement required that HBA execute the Key Person Agreement with Mr. Head, and the Key Person Agreement refers to the Agency Agreement. *Id.* (Exclusive Agency Agreement) at § IV(C), (Appendix A) at ¶ 4. Both Agreements are dated May 1, 2017, and both are signed by Allstate and twice by Mr. Head, once as a Key Person and once on behalf of HBA. *Id.* (Exclusive Agency Agreement) at pp. 1, 13, (Appendix A) at pp. 14–15. The objective manifestation of the parties indicates that the Agreements are part of a single contract.[4]

"The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. 1995). "The parties must have a distinct intention, common to both, and . . . the minds of the contracting parties must meet upon and assent to the same thing in the same sense and at the same time." *Viacom Outdoor, Inc. v. Taouil*, 254 S.W.3d 234, 238 (Mo. Ct. App. 2008) (citing *Macy v. Day*, 346 S.W.2d 555, 558 (Mo.App.1961)). Typically, it is presumed that when an agent expressly signs a contract on behalf of a disclosed principal, the agent intended to bind only the principal. *Wired Music, Inc. of the Great Midwest v. Great River Steamboat Co.*, 554 S.W.2d 466, 468 (Mo. Ct. App. 1977). However, signing a contract twice is a "simple but unequivocal act" to the contrary

---

[4] However, even if they are separate contracts, each was signed by Mr. Head as the Key Person. Mr. Head thereby agreed to be personally bound by the Exclusive Agency Agreement to the extent it imposes obligations on the Key Person, and to be bound by all of the terms of the Key Person Agreement.

7

that illustrates that the parties "mutually agreed and intended that the officer executing the contract for his [LLC] is to assume personal obligations." *See id.* at 470–71.

Here, Mr. Head signed the Exclusive Agency Agreement twice. Doc. 56-1, p. 12. The reasonable interpretation of his dual signatures is that Mr. Head intended to not only bind HBA, but also to bind himself personally as to some of the provisions. Thus, the relevant question is, what did Mr. Head agree to by signing the Exclusive Agency Agreement personally as a Key Person.

Allstate argues that Mr. Head's dual signatures mean that he guaranteed the performance of HBA. Under Missouri law, a signatory is only personally liable as a guarantor if "the language of the so called guaranty clause is sufficient to manifest a clear and explicit intent by the [signatory] to assume a personal guaranty contract." *Cardinal Health 110, Inc. v. Cyrus Pharm.*, LLC, 560 F.3d 894, 899 (8th Cir. 2009). Notably, the cases Allstate cites had clauses that clearly establish a guaranty. For example, a clause that states "[defendant], as guarantor, agrees to perform and fulfill such obligations [under the contract] should [other party] fail to perform" explicitly states that the contracting parties intended the defendant to be liable for any breach. *Spectrum Brands, Inc. v. Compton's, LLC*, No. 16-30, 2018 WL 3995687, at *6 (E.D. Mo. Aug. 21, 2018).[5]

In support of its guaranty argument, Allstate points to two clauses in the Exclusive Agency Agreement, neither of which sets out such a clear and express guaranty. The first clause states, "This Agreement is being entered into with [HBA] in reliance upon and in consideration of the

---

[5] *See also Cardinal Health*, 560 F.3d at 897 ("[t]he undersigned Principal(s) of Applicant . . . hereby jointly and severally, irrevocably, and unconditionally guarantee to [plaintiff] . . . the prompt and full payment (and not merely the ultimate collectability) and performance of all obligation of Applicant to each Guaranteed Party, whether now existing or hereafter arising."); *Wired Music*, 554 S.W.2d at 468–69 ("The individual signing this agreement for the subscriber guarantees that all of the above provisions shall be complied with.").

skills, qualifications, and representations of Stuart Head (referred to in this Agreement as 'Key Person'). [HBA] agrees that it will employ Key Person to provide services under this Agreement for its term." Doc. 56-1 (Exclusive Agency Agreement), § II(E). This provision imposes a duty on HBA to hire Mr. Head to serve as a Key Person. The clause does not suggest an objective manifestation that Mr. Head is agreeing to guarantee HBA's performance.

The second provision, which Allstate refers to as a guaranty clause, reads

> Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

*Id.* (Exclusive Agency Agreement) at § XXI(B) (brackets in the original). This clause similarly omits any reference to Mr. Head guaranteeing performance by HBA. Instead, the focus is on the capacity of HBA and Mr. Head, as the Key Person, to enter into the Exclusive Agency Agreement.

Although Mr. Head did not guarantee the performance of HBA, he did undertake obligations under the Exclusive Agency Agreement as the Key Person. For example, the non-compete provision in the Exclusive Agency Agreement specifically applies to HBA's "officers, directors, shareholders, members, [and] employees, including Key Person." *Id.* (Exclusive Agency Agreement) at § XVIII(D). The Court finds that Mr. Head unambiguously agreed to be bound by the non-compete provision in the Exclusive Agency Agreement when he signed the Exclusive Agency Agreement on behalf of himself as a Key Person. In addition, he is bound by all the terms of the Key Person Agreement, attached as Appendix A, which he signed in his individual capacity as Key Person.[6] Thus, summary judgment on this basis is denied.

---

[6] Again, even if the Key Person Agreement is a separate contract, Mr. Head is personally obligated to comply with the Key Person Agreement and Allstate is a third party beneficiary of that Agreement.

b.   Consideration

Mr. Head contends he did not receive any consideration for the Key Person Agreement he signed.[7] "Either a detriment to the promisee or benefit to the promisor can constitute consideration sufficient to support a contract." *Moore v. Seabaugh*, 684 S.W.2d 492, 496 (Mo. Ct. App. 1984). Such detriment includes the grant of access to "protectable assets and relationships." *JumboSack Corp. v. Buyck*, 407 S.W.3d 51, 56 (Mo. Ct. App. 2013) (citing cases). As in *JumboSack*, Mr. Head "received in consideration . . . access to [Allstate's] new and existing customers . . ." and other confidential information that, parties agree, constitute protectable assets. *Id.*; Doc. 1 (Verified Complaint), ¶¶ 90, 102, 103; Doc. 39 (Answer); ¶¶ 90, 102, 103. Therefore, the Key Person Agreement is supported by consideration. Summary judgment for Mr. Head on this issue is denied.

2.   *Breach*

Allstate alleges that Mr. Head breached the Exclusive Agency Agreement by operating a competing insurance business while under contract with Allstate, failing to return confidential and proprietary information, continuing to use Allstate's telephone number, misusing Allstate's confidential information to solicit customer for HBIG, and violating the Exclusive Agency Agreement non-solicitation clause. If there is evidence of any of these grounds, there is a submissible case of breach, and Mr. Head's motion for summary judgment on this issue must be denied.

Mr. Head asserts that he did not breach the Exclusive Agency Agreement because he returned all confidential information to HBA, had not solicited the purchase of Allstate products

---

[7] Mr. Head only argues that the Key Person Agreement lacks consideration and therefore that is the only argument that will be addressed.

10

or services since Allstate terminated the Agreement, did not have any telephone number in his own name, and has not disclosed any confidential information. Doc. 59-1 (Head Affidavit), ¶¶ 3, 4, 5, 6. As explained below, there is evidence from which a reasonable juror could find that Mr. Head breached the Exclusive Agency Agreement, including the Key Person Agreement.

      a. Operating a Competing Insurance Agency While Still an Allstate Exclusive Agent

Mr. Head agreed not to "either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker" while employed by HBA without the consent of Allstate. Doc. 56-1 (Appendix A), ¶ 9. Allstate has shown that Mr. Head was bound by his agreement with Allstate through July 31, 2017 and that he began operating HBIG, a competing independent insurance agency, in June 2017. Doc. 56-2 (Head Deposition), pp. 64–69, 76, 84–85; Doc. 56-4 (License Affiliations). Mr. Head has not produced any evidence to show that he did not "directly or indirectly solicit, sell or service insurance of any kind for any other company, agent or broker" before the Exclusive Agency Agreement terminated or that his operation of HBIG was not a breach of paragraph 9 of the Key Person Agreement.[8] In fact, Mr. Head only stated that since the termination of the Exclusive Agency Agreement, he has not solicited the purchase of Allstate products or services. Doc. 59-2 (Head Affidavit), ¶ 4, a duty that is not even addressed in paragraph 9 of the Key Person Agreement.

Because Mr. Head's facts do not show he is entitled to judgment as a matter of law, summary judgment on this issue is denied.

---

[8] "Conclusory affidavits . . . do not provide a basis upon which to deny motions for summary judgment." *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993).

11

b.  Failing to Return Confidential Information

The Key Person Agreement provides that "[a]ny and all confidential information . . . will be returned to [Allstate] at any time upon the demand of [Allstate] . . . ." Doc. 56-1 (Appendix A), ¶ 5. Allstate produced a letter sent by Allstate directing Mr. Head to return confidential information to Allstate upon termination of the Exclusive Agency Agreement. Doc. 56-3 (Termination Letters). Mr. Head states that he "returned to Head Brothers Agency, LLC all confidential information belonging to Allstate." Doc. 59-2 (Head Affidavit), ¶ 3. Thus, it is uncontroverted that Mr. Head failed to return the requested information to Allstate, as he was required by the Key Person Agreement and the letter. Returning it Head Brother's Agency did not satisfy his obligation. Mr. Head's motion for summary judgment is denied on this basis.

c.  Misusing Allstate's Confidential Information

Mr. Head agreed not to "use any confidential information for [his] own benefit except for the purposes of assisting [HBA] in performing services under the agency agreement." Doc. 56-1 (Appendix A), ¶ 4. Mr. Head asserts that "[a]t the time Allstate terminated its Exclusive Agency Agreement . . . [he] returned to [HBA] all confidential information belonging to Allstate" and that "he has not disclosed any confidential information belonging to Allstate." Doc. 59-2 (Head Affidavit), ¶¶ 3, 6. Evidence cited by Allstate and undisputed by Mr. Head shows that 1) Mr. Head personally had access to Allstate's confidential information while operating HBIG, Doc. 56-2 (Head Deposition), pp. 84–85; 2) his employee, Ms. Lange, sold insurance for HBA while also affiliated with HBIG, Doc. 56-2 (Head Deposition), pp. 110–12; Doc. 56-5 (HBA Business Metrics); and 3) at least one customer switched insurance providers soon after HBA stopped selling Allstate insurance, Doc. 56-7 (Anderson Insurance Card). Based on this evidence, a jury could find that Mr. Head misused Allstate's confidential information, given Head's involvement in both agencies and his role as the Key Person for HBA, his role in setting up a competing

insurance agency while still the Key Person for HBA, his direct control over Ms. Lange who was affiliated with both HBA and HBIG at the same time and the fact that at least one customer of HBA transferred business to HBIG a matter of days after the termination of the Exclusive Agency Agreement. While this is a close question, summary judgment is denied.

          d.      Violating the Non-Solicitation Clause

The non-compete provision in the Exclusive Agency Agreement prohibits Mr. Head from soliciting the purchase of products or services in competition with those sold by Allstate under certain circumstances. Mr. Head's affidavit states that he did not solicit "products or services of Allstate." Doc. 59-2 (Head Affidavit), ¶ 4. This fact is immaterial, since it is alleged by Allstate that Mr. Head sold competing insurance products. Allstate has not sued Mr. Head for selling Allstate products. Therefore, summary judgment is denied on this basis.

      3.    *Damages*

Mr. Head summarily argues that because Allstate cannot prove breach, Allstate cannot prove any damage. Because the Court has found that there is evidence sufficient to prove breach of contract, Mr. Head's motion for summary judgment on this basis is denied.

    C.    <u>Misappropriation of Allstate's Trade Secrets</u>

To establish a claim under both the Defend Trade Secrets Act of 2016 (DTSA) and the Missouri Uniform Trade Secrets Act (MUTSA), a plaintiff must show 1) that a protectable trade secret exists, 2) the defendant misappropriated the trade secret, and 3) damages. *See Phyllis Schlafly Revocable Tr. v. Cori*, No. 16-01631, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016) (setting out elements of DTSA and MUTSA); *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (listing MUTSA elements). Mr. Head does not dispute

that the information shared by Allstate is a trade secret under both DTSA and MUTSA.  Doc. 1, ¶¶ 90, 102, 103; Doc. 39, ¶¶ 90, 102, 103.[9]

"A misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Roeslein & Assocs., Inc. v. Elgin*, No. 17-1351, 2018 WL 1138465, at *8 (E.D. Mo. Mar. 2, 2018) (misappropriation under DTSA); *accord Signalpoint*, 422 S.W.3d at 321 (misappropriation under MUTSA).  Thus, to prove misappropriation, Allstate must prove either acquisition through improper means, or use or disclosure without consent.

Mr. Head argues that Allstate cannot show misappropriation because Mr. Head returned Allstate's confidential information when the Exclusive Agency Agreement terminated.  First, Mr. Head did not return the confidential information to Allstate, he returned it to HBA.  Second, Mr. Head only had Allstate's consent to use its confidential information for the purposes of "performing services under the agency agreement."  Doc. 56-1 (Appendix A), ¶ 4.  As discussed above with respect to the breach of contract claim alleging Mr. Head misused confidential information, Allstate has put forward sufficient evidence for a jury to find that Mr. Head used Allstate's confidential information for other purposes, including the solicitation of customers.  Therefore, summary judgment is denied.

---

[9] Allstate's petition asserts that Mr. Head had access to Allstate's information in both paragraphs 87 and 102.  Although Mr. Head denied paragraph 87, he admitted paragraph 102.  Similarly, Allstate's petition asserted that the information is a trade secret in paragraphs 90 and 104.  Mr. Head denied paragraph 104, but admitted 90.  The Court reads these admissions together.

## IV. Conclusion

For the reasons set forth above, Mr. Head's motion for summary judgment, Doc. 57, is denied.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: November 19, 2018
Jefferson City, Missouri